**NEW ENGLAND TANK INDUSTRIES OF NEW HAMPSHIRE, INC., Appellant,**

v.

**The UNITED STATES, Appellee.**

**No. 88–1157.**

United States Court of Appeals, Federal Circuit.

Nov. 14, 1988.

Modifications Denied Jan. 13, 1989.*

* See 865 F.2d 243.

Amos Hugh Scott, Choate, Hall & Stewart, Boston, Mass., argued for appellant. With him on the brief were Edward H. Seksay and Kenneth W. Gurge.

J. Keith Burt, Commercial Litigation Branch, Dept. of Justice, Washington, D.C., argued for appellee. With him on the brief were John R. Bolton, Asst. Atty. Gen., David M. Cohen, Director and Thomas W. Petersen, Asst. Director. Also on the brief were Kay Bushman and Richard Saviet, Defense Logistics Agency, Alexandria, Va., of counsel.

Before MARKEY, Chief Judge, BALDWIN, Senior Circuit Judge, and RE, Chief Judge.*

MARKEY, Chief Judge.

Appeal from the decision of the Armed Services Board of Contract Appeals (board), *New England Tank Industries of New Hampshire, Inc.*, No. 26474, 88–1 BCA ¶ 20,395 at 103,156, affirming the Contracting Officer's (CO's) decision denying New England Tank Industries of New Hampshire Inc.'s (NET's) claim for equitable adjustment for services performed under Contract No. DSA 600–02–C–1801 (the Contract) and rejecting NET's argument that the government had invalidly exercised its renewal option. We vacate and remand.

*Synopsis*

This case presents a happily rare, but sad and seamy scenario in which, by concealing facts from its contracting partner, the government succeeded in repeatedly renewing yearly contracts for goods and services the market price of which had long ago increased well beyond the contract price. The primary concealed fact was a regulation governing the funding source the government could cite in the contract. Government compliance with that regulation would have required a change in the contract, enabling the contractor to refuse renewal. To "keep the contract" the government misrepresented its authority in knowingly citing an unauthorized funding source. When the contractor learned the truth and sued, the government says it was bound by its renewal and therefore so was the contractor. Unlike the more common case, in which the government cites its agent's lack of authority as a defense, the government here attempts to use that self-created lack of authority, hidden by its own decision not to publish its authority-denying regulation, as a sword.

---

* The Honorable Edward D. Re, Chief Judge of the Court of International Trade, sitting by des-

## BACKGROUND [1]

### Contract at Issue

In 1959, NET's predecessor in interest contracted with the government to own and operate the Defense Fuel Support Point in Newington, New Hampshire.[2] The basic Contract had a fixed five year term, NET being paid a "use charge" amount per tank per month, plus additional amounts per barrel received into storage per year exceeding a stated amount. The Contract did not contain a funding limitation clause that would have made payment contingent upon availability of appropriated funds.[3]

Section IX of the Contract gave the government annual options to renew for fifteen additional one-year periods *"upon the same terms and conditions"* (emphasis added) as the basic contract, except that the government was to pay NET a set "use charge" per barrel of shell capacity per year.[4]

The five-year term of the Contract expired on 20 July 1965. The parties stipulated that Section IX of the Contract "re-quired the Government to notify NET of its exercise of the option to renew for the following year on or before June 20th of each year during the renewal period." *Id.* at 103,158. It is well settled that to properly exercise that option, the government's acceptance of the offer had to be unconditional and in exact accord with the terms of the contract being renewed. *See id.* at 103,166 (and authorities cited).[5]

### Administration of the Contract

Beginning in 1965, the Department of the Air Force, the administering agency, annually exercised its renewal option. In exercising each option, the practice was to issue a modification obligating from the Air Force Stock Fund an amount covering the entire one-year renewal period. The Air Force had authority to fund fuel supply contracts from a stock fund only because the Air Force Stock Fund Charter expressly waived the requirements of Department of Defense (DoD) Directive 7420.1 § VIII, ¶ A(6) (hereinafter cited as 7420.1).[6]

---

1. Additional background information, including explication of defense contract funding and the use of stock funds, is set forth in the board's comprehensive opinion. 88–1 BCA at 103, 158–159.

2. In the late 1950's the government entered more than thirty long term contracts for fuel storage services and operation of fuel storage facilities. The contract involved here was one such contract.

3. The standard "subject to availability of funds" clause at the time in question provided:

 Funds are not presently available for performance under this contract beyond 30 June 19____. The Government's obligation for performance of this contract beyond this date is contingent upon the availability of appropriated funds from which payment for the contract purposes can be made. No legal liability on the part of the Government for payment of any money for performance under this contract beyond 30 June 19____ shall arise unless and until funds are made available to the Contracting Officer for such performance and notice of such availability, to be confirmed in writing by the Contracting Officer, is given to the Contractor.

 Armed Services Procurement Regulation (ASPR) 1–3186(b) (1974).

4. Section IX provided in full

ignation.

Upon at least thirty (30) days notice by the Government prior to the expiration date of this contract, or any renewal thereof, the Government shall have the option and successive options to renew this contract for fifteen (15) succeeding periods of one (1) year each, upon the same *terms* and conditions except that the use charges to be paid pursuant to Paragraph A(1) of Section I hereof shall be as indicated below:

| Renewal Years | Use Charge (Per barrel of shell capacity per year) |
|---|---|
| 1st year through fifth year | $0.384 |
| Sixth year through tenth year | $0.425 |
| Eleventh year through fifteenth year | $0.468 |

88–1 BCA at 103,157.

5. The government does not quarrel with that statement.

6. 7420.1 states:

 The expense of procurement, warehousing, repacking and handling, or any other function of supply administration pertaining to a stock fund item will not be financed from the stock fund or included in the standard price of the item, but will be charged to appropriations available for operations unless otherwise specifically authorized in a stock fund charter. 88–1 BCA at 103,158–159.

Directive 7420.1, titled "Regulations Governing Stock Fund Operations", has not been published in the Federal Register or Code of Federal Regulations (CFR), *id.* at 103,158. Nonetheless, 7420.1 notes in section IV.A that Defense Agencies are "subject to the provisions of these Regulations."

In addition, a number of code sections and regulations apply generally to DoD funding and stock funds. *E.g.,* 10 U.S.C. § 2208(h) (requiring Assistant Secretary of Defense (ASD) to promulgate stock fund regulations); 10 U.S.C. § 2202 (DoD funds may be obligated only in accordance with regulations); 32 C.F.R. § 236.1 (1975) (all DoD directives dealing with procurement are issued pursuant to 10 U.S.C. § 2202); 32 C.F.R. § 286 (1975) (describing availability of DoD information to public); 32 C.F.R. § 289 (1975) (procedures for obtaining DoD Directives in "7000" series).

In 1973, the Defense Fuel Supply Center (DFSC), a division of the Defense Supply Agency (DSA) (now the Defense Logistics Agency), took over the administration of fuel supply contracts. To smooth the transition to DFSC control, the Assistant Secretary of Defense (Contracts) (ASD(C)) authorized the DFSC to finance the ninth contract renewal from the DSA's Defense Stock Fund. That authorization was given on an interim basis, "pending approval of a revised charter." 88–1 BCA at 103,159. On 22 May 1973, DFSC exercised the government's option to obtain the ninth renewal. The renewal obligated against the DSA Division of Defense Stock Fund $149,480, an amount sufficient to cover the entire one-year ninth renewal period.

At about this same time, NET began requesting DFSC "to renegotiate the rates [paid NET] under the contract" "to change the contract from a losing, to, at least, a break-even situation." Citing changes in the economy "beyond [its] control," such as the imposition of excise taxes on imported crude oil, costs of complying with stricter EPA and Coast Guard regulations, and wage increases, NET estimated its costs

would exceed contract payments by approximately $50,000 per year. A similar request from another contractor estimated that "present contract payments are one-sixth to one-tenth below commercial terminalling rates...." Based on those letters and other evidence, the board found that "NET's persistent requests to renegotiate the terms of the Newington terminal contract gave the Government reason to know that NET would refuse to continue performance of its contract upon the same terms and conditions if the renewal option was not exercised timely and unconditionally." 88–1 BCA at 103,163.

### *DSA Stock Fund Charter*

On 15 March 1974, the Director of DSA submitted a proposed revision of the charter to the ASD(C). That proposed revision did not include an exemption from 7420.1. Indeed, the Director's memorandum accompanying the revision effectively recognized 7420.1 in stating that "[a]doption of this charter will require discontinuation of reimbursement from the Defense Stock Fund for operation-and-maintenance type costs of bulk petroleum facilities previously financed by the Air Force Stock Fund." *Id.* The memorandum did, however, effectively request a waiver of 7420.1 in seeking approval to continue "the present [stock fund] method of operation and funding" through Fiscal Year (FY) 1975 (1 July 1974 to 30 June 1975), *i.e.,* for the tenth renewal, and to "implement the change [to annually appropriated operation and maintenance (O & M) funding] in the method of operation and funding effective with Fiscal Year 1976" (1 July 1975 to 30 June 1976), *i.e.,* for the eleventh renewal. *Id.* at 103,160.

On 24 May 1974, the Commander of the DFSC asked DSA to consider seeking authority to use stock funds for obtaining multiyear contracts for fuel storage services. The Commander expressed concern that existing contracts, presently funded with stock funds, "could be lost to DSA if it is necessary to modify the contracts to use single-year [O & M] funds." *Id.*[7]

---

7. Contracts that are funded annually (where procurement is charged to funds of the next FY

prior to the availability of such funds) must

In a 17 June 1974 memorandum, ASD(C) approved the proposed revision to the charter of the DSA Division of Defense Stock Fund. That revised charter did not include an exemption from 7420.1 for fuel storage facilities and bulk petroleum facilities, though section IV.B of the revision did contain the required exemption for other uses not here relevant, such as into-plane fueling and commercial testing of fuel samples. The memorandum approved deferral of the transition to use of annually appropriated O & M funds (which per ASPR 1–318(a) must have an "availability of funds" clause limiting the government's liability) until FY 1976.

There is no doubt, and it is uncontested, that neither DFSC nor DSA thought it had authority to cite the stock fund when exercising the government's eleventh option to renew. Yet they did cite the stock fund, and did so expressly to avoid the possibility that NET would learn about and seize upon any change in funding source (including a funding limitation clause) as a basis for refusing to continue performance of the contract at a loss.[8]

Indeed, as the board found, the government *knew* that inclusion of a "subject to availability" clause in its renewal, rather than citation of the stock fund, would possibly "provide [NET] a basis for refusing to renew." *Id.* at 103,162. In finding 37 the board detailed an Autumn 1974 DFSC memorandum:

> The memorandum observed that the rate schedules and purchase option prices under several long-term, 10 U.S.C. § 2388 service contracts "are extremely low" (i.e. favorable to the Government) and that these contracts may be lost "if DFSC is limited to use of O & M [operation & maintenance] money (one year funds)." Specific concern was expressed that the one year renewal option for the [NET] contract "may be lost because

[the contract does] not contain a funding limitation clause," noting that ASPR 1–318 "imposes the 'subject to availability of funds' requirement on contracts funded annually." The memorandum concluded by recommending "utilization of the Defense Stock Fund, DSA Division to finance service contracts at bulk fuel terminals." (Parentheticals & brackets in original).

*Id.* at 103,161; *see also* findings 40, 43, 47 & 48, *id.* at 103,161–163, in which the board detailed the government's knowing effort to hide the facts from NET.

### NET's Claim

NET did not become aware of any impediment to DFSC's authority to exercise the option, with citation of the stock fund or otherwise, until August of 1980. *Id.* at 103,165. Soon after becoming aware of the facts, however, NET submitted a certified claim in the amount of $639,849, alleging *inter alia* that it was "entitled to an equitable adjustment for work performed at the direction of the government pursuant to an invalid option exercise." *See International Telephone & Telegraph v. United States,* 453 F.2d 1283, 197 Ct.Cl. 11 (1972).

### The Board's Decision

The board stated that NET's appeal "revolves exclusively around the effectiveness of unilateral modification 36 [the eleventh renewal notice], dated 20 June 1975, as an exercise of the renewal option provided by section IX of the contract." 88–1 BCA at 103,166. The board also said that:

> The effectiveness of the option exercise depends, in turn, on whether modification 36 unconditionally bound both the optionor, NET, and the optionee, the Government, for the entire one-year eleventh contract renewal period, from 21 July 1975 through 20 July 1976. If both par-

---

include an "Availability of Funds" clause. ASPR 1–318(a).

**8.** Had the market price fallen below the contract price, the government would presumably have simply declined to exercise its option to renew the contract "on the same terms and

conditions." Whether, if the market price had fallen just after the government had exercised its option, the government would have disaffirmed the renewal on the ground that DFSC and DSA had no authority to cite the stock fund, is a matter of conjecture.

ties were so bound, then the Government prevails. If the parties were not bound unconditionally, then NET's appeal must be sustained.

*Id.* (citations omitted).[9]

The board focused on "whether there was any basis at all upon which the Government could, if it chose, repudiate its obligations under the modification and treat the renewal as voidable." *Id.* at 103,167.

Though the board agreed with NET that DFSC's and DSA's "authority to use the Defense Stock Fund for fuel storage terminal contracts was limited [by Directive 7420.1] to financing services to be performed before 1 July 1975,"[10] *id.* at 103,168, it disagreed with NET's argument that the government's unauthorized citation of the stock fund and disregard of 7420.1 meant that "modification 36 was not binding on the government and could have been disaffirmed by the government." *Id.* at 103,169.

Distinguishing, without citation of authority, between regulations having the "force and effect of law" binding on "federal agencies or their officers and employees," *id.* at 103,170, and regulations "having such general applicability and legal effect as to create legally binding rights in and obligations on the public," *id.*, the board concluded that "the Government was bound by modification 36 and could not thereafter disaffirm it" because: (1) 7420.1 was not published in the Federal Register [or incorporated by reference], *id.* at 103,173 & n. 31; (2) NET had no actual knowl-

edge of its terms at the time DFSC exercised the option for the eleventh renewal period or for many years thereafter, *id.* at 103,173; and (3) "the exercise of the renewal option was in all other respects within the scope of the contracting officer's authority." *Id.*[11]

The board said its holding "obviate[d] consideration of the Government's arguments" that: (1) use of the stock fund, even if mistaken, was within the contracting officer's actual authority to exercise the renewal option; and (2) 7420.1 was merely an internal procedural or housekeeping instruction of an accounting or administrative nature and thus would have no legal effect even if it had been published. *Id.* at 103,173 n. 32.

### ISSUES

(1) Whether the DSA and DFSC had authority to use and cite the stock fund to finance the eleventh contract renewal.[12]

(2) If DSA and DSFC lacked such authority, whether their purported exercise of the eleventh renewal of the contract was nonetheless valid and effective.

### OPINION

#### *Introduction*

NET's main argument on appeal is that the board incorrectly extended *Federal Crop Insurance Corp. v. Merrill,* 332 U.S. 380, 384, 68 S.Ct. 1, 3, 92 L.Ed. 10 (1947) (where regulation was published, and agent

---

**9.** NET argued to the board that the government's renewal notice, though timely and unconditional on its face, "was ineffective because the DFSC [CO] lacked authority to use or cite the Defense Stock Fund, as he did in block 10 of modification 36.... Consequently, [argued NET,] the renewal option was voidable, if not void *ab initio....*" *Id.* at 103,167.

**10.** The board said: "Given the contemporaneous understanding by responsible DSA and DFSC officials of the meaning to be attached to certain internal DoD documents (DoD Directive 7420.1 and the 1974 Charter revision [failing to include a specific exemption for fuel storage facilities from 7420.1, *id.* at 103,160 & n. 9] ), we conclude that as of 20 June 1975 DSA's and DFSC's authority to use the Defense Stock Fund

for fuel storage terminal contracts was limited to services to be performed before 1 July 1975." *Id.* at 103,168. That conclusion was supported by several subsidiary findings, *e.g.,* findings 57, 59 & 67. *See id.* at 103,164–165.

**11.** The board also rejected NET's argument that "citation of stock funds in block 10 of modification 36 constituted a 'palpably illegal' violation of statutory controls on fiscal accountability: the Antideficiency Act, 31 U.S.C. § 1341(a)(1), and the 'Adequacy of Appropriations Act,' 41 U.S.C. § 11(a)." *See id.* at 103,168.

**12.** The answer to that question would be applicable, of course, to subsequent renewals in this case.

exceeded his authority, a contractor could not bind the government) in holding that the government was bound because it did not publish its authority-denying regulation. In NET's view, "[t]he proper inquiry under *Merrill,* ... is simply whether a statute or legislative-type regulation curtailing an agent's actual authority existed, rather than whether the agent or the party contracted with had any knowledge of the limitations on the agent's authority." Thus, says NET, because "[g]overnment agents, unlike their private counterparts, possess only actual authority and cannot act with either apparent or inherent authority," and because "[the CO's] actions [sic, the actions of DSFC and DSA] with respect to [the renewal notice] exceeded the scope of his [their] authority, violated statutes and legislative-type regulations," "the government was not bound by his [their] actions." NET concludes: "Since one party, the government, was not bound by the purported option exercise, that exercise was ineffective and the contract lapsed ... on July 20, 1975."

The government does not defend before us the board's view on the effect of nonpublication. On the contrary, it joins NET in saying that the board's view "appears squarely to contradict the holding of [*Merrill* ]." The apparent concern of the government is that adherence to the board's view would bind the government to all unauthorized contracts where lack of authority was not actually or constructively (as by publication) known to the contractor.[13]

### 1. *Authority to Cite the Stock Fund*

▓ The government here argues, as it did to the board, that DSA and DFSC did have actual authority to cite the stock fund, thus both DSA and NET were bound

to the option.[14] That argument is based on the above-mentioned June 17, 1974 memorandum from the ASD(C):

> I believe the planning which you are jointly conducting with the Military Services to finance directly the operation and maintenance type costs of bulk petroleum facilities is in consonance with the policy I enunciated ... Approval is granted to defer implementation until Fiscal Year 1976.

The government says DSA had authority to use the stock fund to finance the option, and was therefore unconditionally bound by its exercise of the option, because: (1) "[i]t is well established that, as long as funds are obligated in the fiscal year authorized, they may be spent in the following fiscal year" (citing 31 U.S.C. § 1502(a) and numerous Comptroller General cases); (2) the June 17 memorandum "expressly authorized DSA to continue to obligate the stock fund to finance bulk petroleum contracts until fiscal year 1976—or through June 30, 1975", the end of FY 1975; and (3) the option was exercised nine days before the close of FY 1975, at the time DSA gave renewal notice. Thus, says the government, "contrary to NET's assertion," "neither DSA nor NET could have disavowed the option."

The government does not argue that no facts of record support the board's finding that, despite the June 17 memorandum, DSA's and DFSC's authority to cite the stock fund did not exist. The government does argue, unpersuasively, that the board erred when it "conclude[d] that DSA's 'failure to proceed in an unqualified manner' regarding use of the stock fund ... undermined DSA's authority to so obligate the funds."

---

**13.** It should go without saying that our decision here is limited to the present fact pattern, in which the government exercised a renewal option, citing an unauthorized funding source contrary to that specified in a regulation it elected not to publish, and concealed the regulation from the contractor to the benefit of the government and the detriment of the contractor. NET seeks to escape the contract and it is the government that is trying to uphold its unauthorized enforcement of its option. Nothing here said

should be interpreted as a holding that a contractor could bind the government to an unauthorized contract on the sole ground that the contractor did not know of the government agent's lack of authority.

**14.** As stated earlier, *supra* note 10 and accompanying text, the board found that no such actual authority existed.

The government's argument incorrectly assumes that the June 17 memorandum expressly gave DSA authority to cite the stock fund, and that the board so found. In reality, the board discussed the issue of authority broadly and looked to contemporaneous events to shed light on that authority and on the asserted "plain meaning" of the memorandum. Though the board correctly recognized that performance of the contracts in FY 1976 would make no difference *if* the alleged authorization had occurred, it correctly found that no such authority had been given.

In finding that DSA and DFSC lacked authority to cite the stock fund, the board made these subsidiary findings: (1) DFSC officials failed to proceed in "an unqualified manner" in "financ[ing] the entire renewal periods of all four 10 U.S.C. § 2388 contracts during [FY] 1975," *id.* at 103,168, of which the NET contract was one; (2) in dealing with a similar contract (the Holly contract), DSA Comptrollers only authorized DFSC Comptrollers to renew that contract "without 'subject to availability' language ... 'a month at a time,'" *id.* at n. 21; (3) "responsible DSA and DFSC fiscal officials harbored the belief that the stock fund was available only for financing fuel storage services to be performed up to but not beyond 30 June 1975," *id.;* (4) "deposition excerpts [cited by the Government to the contrary] are not credible and conflict with evidence of the deponents' contemporaneous conduct and beliefs," *id.;* (5) in May of 1975 "DSA requested OSD to furnish a memorandum granting tentative approval of DSA's plan to continue using the stock fund into [FY] 1976, but no such memorandum was sent before September 1975." *Id.*

The quoted subsidiary findings totally undermine the government's assertions about the "plain meaning" of the June 17 memorandum and fully support the board's finding that DSA's authority was limited to "financing services to be *performed* before 1 July 1975." *Id.* (emphasis added). Nothing of record would remotely indicate that that finding, or any of the five subsidiary findings, was not supported by substantial evidence.

### 2. *Validity of the Renewal* [15]

■ The board's three reasons for holding that the government could not disaffirm its renewal cannot withstand analysis: (1) lack of publication was the government's doing; (2) NET's lack of knowledge stemmed from the government's lack of publication; and (3) that the government's exercise of its option was authorized "in all other respects" is simply irrelevant. We need say no more about the board's reasons for its "could not disaffirm" determination, because the board was answering the wrong question.

The dispositive question is whether the government's exercise of its option to renew the contract was valid or invalid. As above noted, the board recognized that an attempt to alter the contract terms would "render ineffective the purported exercise of an option," and that insertion of an "availability of funds" clause renders the option exercise "invalid", *see* 88–1 BCA at 103,166, and neither party quarrels with those statements of the law. It is uncontested that if the government had complied with 7420.1 NET would have had the right to avoid further performance of the Contract.

The board did state that the issue is "the consequences of [exceeding] that [7420.1] limitation." The board did not speak to that issue, however. It focused solely on the wrong question, *i.e.,* whether there was a basis on which the government could have disaffirmed the option, once it had exercised it. Resolution of that question does not resolve whether the purported exercise of the option was invalid *ab initio,* due to DSA's deceitful and knowing contravention of 7420.1. Nor does resolution of

---

15. Though we have considered all of NET's arguments, we discuss only its first—the consequence of DSA's violation of 7420.1. We agree with the board that citing and paying from the stock fund, though done without authority, did not run afoul of the Antideficiency Act or the Adequacy of Appropriations Act. We also reject NET's invitation to declare the instant contract unenforceable on public policy grounds.

the board's question answer whether the government is entitled to gain from the deceit perpetrated by its agents.

 In constructing its bright line test that would make publication determinative of whether the government is bound by a regulation directing use of a funding source, the board ignored the severely adverse affect on the contractor. NET is unable to recover the fair market value of the services it provided, merely because, says the board, 7420.1, though violated by DSA, was unpublished. The government controls publication of its regulations, and its decision not to publish enabled it here to pretend that its citation of the stock fund was proper. To say that the government may escape the consequences of actions knowingly contrary to its agent's authority, by the twin devices of concealing the facts from its contractor and taking care not to publish the authority-denying regulation, smacks too much of a "heads-I-win—tails-you-lose" approach unworthy of our government.

The board's attempt to distinguish regulations binding on government agents and those binding on the public, and its indication that unpublished regulations create no rights in the public, whatever may be its validity in other contexts, need not detain us long here. 7420.1 by its very terms applies *only* to the government's contracting agents.

The board's citation of *Turney v. United States*, 115 F.Supp. 457, 126 Ct.Cl. 202 (1953) does not support its broad view that the government violation of a regulation not disclosed to the public cannot invalidate a transaction with a contractor unaware of the limitations. 88–1 BCA at 103,171. In *Turney*, unlike the facts here, the unpublished regulation conflicted with a statute which was necessarily given precedence. Further, in *Turney*, as in *Kurz & Root Co.*, ASBCA No. 17146, 74–1 BCA ¶ 10,543 [available on WESTLAW, 1974 WL 1628] *aff'd*, 227 Ct.Cl. 522 (1981), and again unlike the facts here, a contractor sought to bind the government to the

terms of a contract. There is no authority for the inverse proposition resulting from the board's reliance on nonpublication, *i.e.*, that the government may properly violate its own regulation applicable only to its own actions when it is to the benefit of the government to do so, induce the contractor's performance by hiding that violation from him, make it impossible for the contractor to find out by not publishing the regulation, and then, when the scheme is uncovered, ask the court to give its actions legal effect.

 We recognize that the consequence of the government's failing to follow regulations in this case could be an equitable adjustment paid out of the public fisc and further recognize the presence of elements similar to those present in the enforcement of an equitable estoppel against the government. *See Lyng v. Payne*, 476 U.S. 926, 933–35, 106 S.Ct. 2333, 2338–39, 90 L.Ed.2d 921 (1986). Indeed each element of the typical equitable estoppel against the government situation is present here. *See Emeco Indus. v. United States*, 202 Ct.Cl. 1006, 1014–19, 485 F.2d 652, 657–60 (1973) (listing & applying the elements of equitable estoppel against the government); *see also Fink Sanitary Service, Inc.*, 53 Comp.Gen. 503, 506–07 (1974).

 The facts of this unique case make NET's cause even more compelling than those in which the result has been labeled "equitable estoppel". Here NET is *not* attempting to bind the government to the contract. Nor does it attempt to bind the government to its agents' misrepresentations. On the contrary, NET wishes the agent had complied with 7420.1 and seeks equitable adjustment for the consequences it suffered when DSA's deceit precluded it from learning the true facts and exercising its rights. Far from using lack of actual authority as a shield for the public fisc, the board's view would allow the government to use that lack as a sword against a contractor and thus to protect the fruit of its agent's deceit.[16] Nor do we expect that the

---

16. The general rule of agency, subject to exceptions not relevant here and not in all its aspects appropriately applied to the government, is that if a principal receives a benefit as a result of his

government's conduct in this case will be repeated so often as to constitute a grave risk to the public fisc. Nor do we view the public fisc so sacrosanct in each and every case as to place its protection before the candor and fair dealing a free society is entitled to expect from its government.

In sum, we do not view this case as controlled by *Heckler v. Community Health Services*, 467 U.S. 51, 60, 104 S.Ct. 2218, 2224, 81 L.Ed.2d 42 (1984), *Schweiker v. Hansen*, 450 U.S. 785, 788, 101 S.Ct. 1468, 1470, 67 L.Ed.2d 685 (1981) (per curiam) (cases recognizing the strong interest of government in protecting the public fisc and refusing to decide what type of conduct, if any, would entitle a private citizen to estop the government), or any other case.

### Issue on Remand

■ It is difficult to perceive how a regulation that has been held by the board, and now by this court, to have unequivocally denied authority to use the stock fund can be said to have been non-mandatory. Further, as above indicated, we abhor the DSA and DFSC's scheme in which they knowingly and secretly conspired to cite the stock fund, in contravention of 7420.1, to save a contract favorable to the government and devastatingly unfavorable to the government's contracting partner. Nonetheless, we are bound by the rules of the judicial process to forgo deciding at this stage the issue argued by the government and by-passed by the board. That issue, though variously stated by the board, is whether 7420.1 is a mandatory or binding regulation. *See Schweiker v. Hansen*, 450 U.S. 785, 789, 101 S.Ct. 1468, 1471, 67 L.Ed. 2d 685 (1981) (not all agency documents have binding force); *Nordstrom v. United States*, 342 F.2d 55, 59, 169 Ct.Cl. 632, 638 (1965) (legal rights flow from mandatory,

not directory, requirements). It is mandatory regulations that "have the force and effect of law." *Accardi v. Shaugnessy*, 347 U.S. 260, 265, 74 S.Ct. 499, 502, 98 L.Ed. 681 (1954); *see Morton v. Ruiz*, 415 U.S. 199, 235, 94 S.Ct. 1055, 1074, 39 L.Ed. 2d 270 (1974) ("it is incumbent upon agencies to follow their own procedures," even where those procedures "are possibly more rigorous than otherwise would be required"); *Horner v. Jeffrey*, 823 F.2d 1521, 1529–30 (Fed.Cir.1987) (distinguishing between "legislative" and "interpretive" rules); *Voge v. United States*, 844 F.2d 776, 779 (Fed.Cir.1988) and *Boddie v. Department of Navy*, 827 F.2d 1578, 1580 (Fed.Cir.1987).

We recognize that "not 'every piece of paper emanating from a Department or independent Agency is a regulation,'" *Doe v. Hampton*, 566 F.2d 265, 281 (D.C.Cir. 1977) (quoting *Piccone v. United States*, 407 F.2d 866, 877, 186 Ct.Cl. 752, 771–72 (1969) (Nichols, J., concurring)), yet we also note the statutory prohibition of the obligation of DoD funds except in accord with regulations, 10 U.S.C. § 2202, and that 7420.1 was created pursuant to specific statutory authority, refers to itself as a regulation, and contains no grant of discretion but, on the contrary, employs mandatory terms such as "will not" and "will" rather than directory terms such as "should." *See Community Nutrition Institute v. Young*, 818 F.2d 943, 947 (D.C. Cir.1987) (use of "mandatory, definitive language is a powerful, even potentially dispositive, factor"); *compare American Business. Ass'n v. United States*, 627 F.2d 525, 532 (use of "will" indicates statement is binding norm) *with Guardian Federal Sav. & Loan Ass'n v. FSLIC*, 589 F.2d 658, 667 (D.C.Cir.1978) (use of "may" indicates statement is a "general statement of policy").[17]

---

agent's conduct, he cannot keep that benefit and escape responsibility for the means by which it was acquired. *See* Restatement of Agency § 282(2)(c) & Comment H. The Comment notes the rule is basically one of restitution, *see* Restatement of Restitution § 123, and that a contrary rule would unjustly enrich principles. *See also* Restatement of Agency §§ 263 & 274 (a person can not properly retain property which

has been acquired for him by fraud or other unlawful means).

17. That 7420.1 is unpublished is a factor to be considered in determining whether it was intended as a regulation. *See Piccone*, 407 F.2d at 877. That factor, however, is not determinative. *See Community Nutrition*, 818 F.2d at 947 & n. 8. We think that factor even less probative

Classifying 7420.1 in the first instance is not an inquiry "well suited to an appellate court." *Doe v. Hampton,* 566 F.2d 265, 281 (D.C.Cir.1977); *see Piccone,* 407 F.2d at 877. Notwithstanding the board's holding that 7420.1 was a denial of authority, our inquiry would be inadvisable here, where the board declined to consider the government's argument that 7420.1 is not a binding regulation, the record on appeal contains merely the text of 7420.1, and the parties have not focused on the issue. The board found incredible the exculpatory, after-the-fact testimony of DSA and DFSC representatives, but the record is devoid of statements by an authoritative official of DoD, the agency that issued 7420.1. Though it may be difficult to imagine how a regulation that denies authority to use the stock fund was intended to permit that use, the Supreme Court has stated that the intent of the issuing authority is a factor to consider. *See Thorpe v. Housing Authority of City of Durham,* 393 U.S. 268, 89 S.Ct. 518, 21 L.Ed.2d 474 (1969). Such intent, if ascertainable, is entitled to deference. *See Brock v. Cathedral Bluffs Shale Oil Co.,* 796 F.2d 533, 537 (D.C.Cir. 1986) (Scalia, J.).[18]

Accordingly, we remand to the board for the sole purpose of determining the DoD's intent in issuing 7420.1 at the time it was issued. That intent may be ascertained by examining "the language, its context, the persons or offices affected, and any available extrinsic evidence," *Hampton,* 566 F. at 281, including the factors above noted. If the board determines that 7420.1 is a "binding regulation", *Brock,* 796 F.2d at 533, a decision should be issued forthwith for NET.

## CONCLUSION

The decision of the board in favor of the government is vacated and the case is remanded for a determination of whether 7420.1 is a mandatory regulation binding on the government and for such further proceedings, consistent with this opinion, as the board may deem necessary.

## COSTS

Each party to bear its own costs.

**VACATED AND REMANDED.**

BALDWIN, Senior Circuit Judge, concurs in the result.

where, as here, 7420.1 imposes burdens on the government, rather than on the public, and does not appear to be of the "general applicability" that would require publication.

18. "But there is deference and there is deference —and the degree accorded to the agency on a point such as this is not overwhelming.... [O]f far greater importance is the language used in the statement itself." *Id.* at 537–38.