**UNITED STATES of America**

v.

**14.87 ACRE OF LAND,
More or Less, et al.**

**No. C–80–350–L.**

United States District Court,
D. New Hampshire.

Aug. 6, 1992.

Asst. U.S. Atty. Gretchen Witt, Concord, N.H., David Vollenweider, Dept. of Justice, Washington, D.C., for plaintiff.

A. Hugh Scott, Choate, Hall & Stewart, Boston, Mass., Garry R. Lane of Ransmeier & Spellman, Concord, N.H., for defendants.

## ORDER ON MOTION FOR SUMMARY JUDGMENT

LOUGHLIN, Senior District Judge.

*Factual and Procedural Background*

This case has a long frustrating history in this Court as well as the Federal Circuit Appeals Court.

The litigation arises out of a 1959 agreement between the United States and New England Tank for the construction and operation of a fuels storage facility along the Piscataqua River at a tank farm in Newington, New Hampshire. The purpose of the agreement was to provide fuel storage and service to nearby Pease Air Force Base, Newington, New Hampshire. Under the agreement, the United States funded all land and equipment costs, as well as all construction costs for improvements on the property. After approximately twenty years of operation of the facility constructed at government expense, during which time the facility was dedicated solely for the use and benefit of the United States, the United States obtained the subject property by condemnation. Now at issue is the amount of just compensation due New England Tank. In the contract New England Tank was to provide bulk fuel storage services to the government at a tank farm in Newington, New Hampshire. The contract had a basic five year term and provided for fifteen one-year renewal options. See Contract at p. 1 and Section IX. It also granted the government the option to purchase the tank farm at specified prices "[a]t any time during the life of this contract or any renewal thereof." *Id.* at Section X.

At the time of the eleventh annual renewal of the contract in 1975, the government, unbeknownst to New England Tank, intentionally cited an unauthorized funding source to pay for the renewal. *New England Tank Industries of New Hampshire, Inc. v. United States*, 861 F.2d 685, 686–89 (Fed.Cir.1988). (*"New England Tank (Fed.Cir. I)"*) (Ex. C). It did so because it was concerned that citation of a different but authorized funding source would give New England Tank grounds for refusing the contract renewal, which the government feared New England Tank would do because it was losing money on the contract. *Id.* at 686, 689. As a result of the government's use of unauthorized funds for the 1975 contract renewal, that renewal was ineffective and the contract lapsed in mid–1975. *Id.* at 691–95; *New England Tank Industries of New Hampshire, Inc.,*

90–2 BCA (CCH) p. 22, 892 (1990) at ¶ 114, 968–69 (*New England Tank (ASBCA II*")) (Ex. E).

Unaware of the situation, New England Tank continued to perform services for the government through the twentieth and last one-year renewal period in 1980, at which point the government filed the present condemnation case, seeking to "enforce the Government's option to purchase" the tank farm contained in the parties' 1959 contract. Complaint in Condemnation ¶ 9 (Ex. F).

During 1980, New England Tank first learned of the government's attempt in 1975 to renew the contract with unauthorized funds. New England Tank thereupon responded in this case that the purchase option had expired in 1975 when the government had failed properly to renew the contract (Answer, ¶ 9 and First Affirmative Defense (Ex. G) and then filed an administrative claim in 1982 with the Armed Services Board of Contract Appeals (the "ASBCA" or the "Board") seeking an equitable adjustment to its payment for services rendered to the government from 1975 to 1980 ("*New England Tank (ASBCA I:*) (Ex. B).

This Court, recognizing the obvious overlap in issues between the condemnation case and the ASBCA case, noted in an order in late 1981 that the government sought to enforce a contract option to purchase property and that "[a]ll parties agree that a substantial number of issues will be resolved in these administrative proceedings [which New England Tank had brought before the ASBCA] and that these findings will bind the parties." Order, dated November 23, 1981 (Ex. H). In late 1983, on the government's motion, the Court stayed proceedings in this case, ordering that the Court be given periodic status reports of the ASBCA action. Order, dated December 16, 1983 (Ex. I). As the ASBCA case wended its way to appeal, this Court in early 1988 removed this case from its active docket, subject to any party's motion to reopen the case should further proceedings become necessary or de-

sirable. Judgment and Order, dated January 25, 1988 (Ex. J).

### A. The Initial ASBCA Decision

After the government contracting officer rejected New England Tank's claim for an equitable adjustment, the company appealed to the Armed Services Board of Contract Appeals pursuant to the Contract Disputes Act, 41 U.S.C. § 601 et seq. *New England Tank (ASBCA I)* at p. 103, 166.

In late 1987, the Board issued its initial decision. *New England Tank (ASBCA I)* at p. 103, 156 et seq. After noting that New England Tank "claims additional compensation ... for being required to continue performance under the allegedly lapsed contract and also claims that an option to purchase contained in the contract was extinguished by the Government's ineffective exercise of the renewal option," the ASBCA proceeded to make seventy numbered paragraphs of detailed fact findings, based upon the voluminous records submitted to the Board. *Id.* at p. 103, 156–66. The Board found that Section IX of the contract required the government to exercise its successive renewal options each year and Section X gave the government the option to purchase the tank farm "throughout the renewal period." *Id.* at p. 103, 157–58. The key issue was the effectiveness of the 1975 contract renewal: "Disposition of this appeal revolves exclusively around the effectiveness of [the June 1975 governmental action] as an exercise of the renewal option provided by Section IX of the contract." *Id.* at p. 103, 166. The ASBCA concluded that, although government agents had used an unauthorized funding source for the June 1975 renewal action (*id.* at p. 103, 168–69), the government would as a legal matter still be bound to the contract and the renewal was therefore legally effective (*id.* at p. 103, 171–73).

### B. The Federal Circuit Appeal

On Appeal, the Federal Circuit, while concurring that the government had used unauthorized funds for the 1975 renewal, disagreed with the Board's legal conclusion that the renewal was effective. *New England Tank (Fed.Cir. I)*, 861 F.2d at 691–94. The court observed,

... we abhor the DSA and DFSC's [the responsible agencies] scheme in which they knowingly and secretly conspired to cite the stock funds, in contravention of [Department of Defense Directive] 7420.1, to save a contract favorable to the government and devastatingly unfavorable to the government's contracting partner.

*Id.* at 694. According to the Court of Appeals, "[t]he dispositive question is whether the government's exercise of its option to renew the contract was valid or invalid." *Id.* at 692. This, in turn, depended upon whether the regulation violated by the improper fund citation was a "mandatory" regulation or not; if the regulation was mandatory in nature, then its violation would render the option exercise invalid. *Id.* at 692–94. Although the Court of Appeals observed that "[i]t is difficult to perceive how [the regulation in question] can be said to be non-mandatory," the court remanded the case to the ASBCA for a formal ruling on that limited issue. *Id.* at 694–95.

The government petitioned for reconsideration. *New England Tank Industries of New Hampshire v. United States*, 865 F.2d 243 (Fed.Cir.1989) *("New England Tank (Fed.Cir. II)"* (Ex. D). Among its arguments was that:

... a voiding of the contract would remove the government's opportunity to acquire NET's facility for [the purchase option price of] $295,000, that it has now condemned the facility, and that there is now a suit in the district court on the matter, in which NET is claiming that its facility is worth $6 million.

*Id.* at 248. The court observed that the government's argument that its "conduct here should be excused because it had more to lose than below-market prices for fuel" was "obviously insufficient to warrant a change in our characterization of the government's conduct." *Id.* The petition was denied. *Id.*

### C. The Final ASBCA Decision

Upon remand from the Court of Appeals, and after an evidentiary hearing, the ASBCA concluded that the regulation in question was (as the Court of Appeals had suggested) "mandatory" in nature and issued a decision in favor of New England Tank, sustaining its claim that it was entitled to an equitable adjustment for services rendered after the contract lapsed in 1975. *New England Tank (ASBCA II)*, 90–2 BCA (CCH) at p. 114, 968–69. The government elected not to appeal to the Federal Circuit, and the decision became final on August 20, 1990.

After a period of negotiations with the government, during which time the government also finalized an Amended Declaration of Taking concerning the legal description of the condemned property, New England Tank moved to reopen this case and reinstate it to the Court's active docket. That motion was allowed on April 9, 1992.

The United States has contended that the compensation due is governed by the original agreement between the parties, which allowed the United States to purchase the property and improvements for $295,000, which amount was filed with the Court at the initiation of the condemnation action in 1980, and was previously withdrawn by New England Tank. New England Tank argues that the agreement lapsed before the government exercised its purchase option. It is the United States' further contention that even if the prior agreement is not now binding, it would be unjust and a windfall to New England Tank to require the government to pay again for the improvements it funded in the first place. If the agreement is not effective, then the maximum the government is obligated to pay for now is the property that was not previously purchased and/or improved at the expense of the public pocketbook. The issue of double payment, and this Motion for Partial Summary Judgment, need only be addressed if the Court finds that the United States did not timely exercise the purchase option clearly set forth in the agreement of the parties, made in 1959.

By way of further background, the Military Petroleum Supply Agency ("MPSA") was established in 1956 to operate as the single military manager of petroleum fuels. In 1962, MPSA was redesignated the De-

fense Petroleum Supply Center ("DPSC"), and still later again renamed the Defense Fuel Supply Center ("DFSC"). This federal agency operated under the authority of the Secretary of Defense. One of the responsibilities of the DFSC (and its predecessor) was the award and administration of contracts for bulk petroleum storage. The services to be performed under these contracts consisted of receiving, storing, and distributing petroleum products such as aviation gasoline and jet fuel owned by the United States.

In 1955, the Department of Defense ("DOD") was concerned that aviation fuel storage facilities were located in highly vulnerable areas and recognized the need to build new storage facilities in outlying areas. *See* Exhibit 1, Legislative History. In 1956, to induce the commercial petroleum industry to build facilities where the DOD needed them, Congress passed 10 U.S.C. § 2388. Section 2388 authorized long term contracts for the necessary fuel services, and permitted the use of an option to purchase the facility at the expiration or termination of the contract. 10 U.S.C. § 2388(c).

10 U.S.C. § 2388 states in pertinent part: "[T]he Secretary of a military department may contract for the storage, handling, and distribution of liquid fuels for periods of not more than five years, with options to renew for additional period of not more than five years each, but not for more than a total of 20 years."

The requirements of the contract included a minimum capacity of 360,000 barrels of storage, with related facilities, and a pipeline to Pease Air Force Base. Under the contract, the United States would provide monies for the purchase of the land for the facility, monies for the construction of improvements upon the facility, and monies for necessary equipment for the facility. The contract price, according to New England Tank, included construction costs and the cost of real estate, in the amount of $2,573,825. The contract between the United States and New England Tank required the contractor to furnish and operate a fuel facility for the exclusive use of the Government. The facilities to be provided to the Government included tanks, a dock, pipelines and connections, truck loading facilities, an administration building, a laboratory, an electrical generating system, and a security system. This figure included $540,000 in interest costs for financing construction and $225,852 for profit and contingencies. *See* New England Tank Letter (Ex. 2) hereto) and Declaration of Linda H. Mazza (filed herewith). The original contract price was $3,718,665 for the first five years, divided into equal payments of $743,731 per year. *See* Contract previously filed and Mazza Declaration. At New England Tank's request, the contract was modified six months after its execution to allow payment of $2,000,000 for the first year rather than the agreed upon $743,731 to help New England Tank finance the construction of the facility. *See* Change 2, Contract. Payments for the next four years were then adjusted downward. *Id.*

Although the facility would be owned and operated by New England Tank, *the United States paid for the entire cost* of construction, including acquisition of the real estate upon which the improvements were made. *See* Mazza Declaration.

On February 4, 1980, the United States gave New England Tank notice of its intention to exercise its contract option to purchase the petroleum storage facilities, including the underlying land, for the agreed upon price of $295,000.00. New England Tank refused to honor the option. On July 17, 1980 the United States tendered the full, agreed upon $295,000 and requested that New England Tank execute a deed granting the government rights in the facilities, as contemplated by the purchase option. New England Tank refused. Therefore, the United States filed this condemnation action the same day, and ultimately took possession of the property.

The United States contends that the equitable principles of just compensation require that the subject property be valued, on the date of taking, without any consideration being given to the value of the improvements previously paid for by the Unit-

ed States; that is, as vacant land; and with credit given to the United States for the funds it expended in the purchase of the vacant real property, including financing costs.

Defendant, New England Tank, contends that the property must be valued with the improvements made by the United States in place, with no credit given for the fact that the United States funded all acquisition and construction in the first place.

■ 40 U.S.C. § 258a provides that in condemnation proceedings by and under the authority of the United States just compensation shall be paid for the land taken. Proper standard to be used in determining fair market value is what a willing buyer would pay in cash to a willing seller at time of taking. *Branning v. United States,* 6 Cl.Ct. 618 (1984).

■ As heretofore stated, the government contends that fair market value is inappropriate where the government initially funds the construction of the property. This argument is apparently refuted by *Calvo v. United States,* 303 F.2d 902 (9th Cir.1962) where government constructed a dirt road during the term of a one year lease. Upon government's subsequent condemnation, property owner was entitled to value of land as enhanced because of the road. In the case of *United States v. Buhler,* 305 F.2d 319 (5th Cir.1962) it was held that the landowners were entitled to be compensated for the real value of the property taken, even if that value has been greatly enhanced by government improvements on the land at the date of taking.

The court rules that the measure of just compensation in this case is the fair market value of the land at the date of taking. Further, that the fair market value shall not be diminished by any improvements that the government has made.

### D. Collateral Estoppel

The court next addresses the issue of collateral estoppel. The defendant contends that the government is collaterally estopped from attempting to relitigate the issue of whether the contract lapsed in 1975.

■ Collateral estoppel, like the related doctrine of res judicata, has the dual purpose of protecting litigants from the burden of relitigating an identical issue with the same party or his privy and of promoting judicial economy by preventing needless litigation. *Parklane Hosiery Co. v. Shore,* 439 U.S. 322, 326, 99 S.Ct. 645, 649, 58 L.Ed.2d 552 (1979).

■ In recent years, this Court has reaffirmed the benefits of collateral estoppel, in particular finding the policies underlying it to apply in contexts not formerly recognized at common law. Thus, the Court has eliminated the requirement of mutuality in applying collateral estoppel to bar relitigation of issues decided earlier in federal-court suits, *Blonder–Tongue Laboratories, Inc. v. University of Illinois Foundation,* 402 U.S. 313, 91 S.Ct. 1434, 28 L.Ed.2d 788 (1971), and has allowed a litigant who was not a party to a federal case to use collateral estoppel "offensively" in a new federal suit against the party who lost on the decided issue in the first case. *Allen v. McCurry,* 449 U.S. 90, 94, 95, 101 S.Ct. 411, 414, 415, 66 L.Ed.2d 308 (1980).

Five elements must be present to permit application of collateral estoppel principles:

1. the determination (in this case a legal determination as to the existence of a contract) must be over an issue which was actually litigated in the first forum; 2. that determination must result in a valid and final judgment; 3. the determination must be essential to the judgment which is rendered by, and in, the first forum; 4. the issue before the second forum must be the same as the one in the first forum; and 5. the parties in the second action must be the same as those in the first.

*N.L.R.B. v. Donna–Lee Sportswear Co., Inc.,* 836 F.2d 31, 34 (1st Cir.1987). Because the term estoppel encompasses myriad definitions which cut across a number of different areas of the law, we adopt here the somewhat more particularized term of "issue preclusion" to refer to situations where a later court is bound by a prior

determination of an issue. *Donna–Lee Sportswear*, 836 F.2d at 33.

The issue of the validity of the 1975 contract renewal was decided by the Federal Circuit Court of Appeals. *New England Tank* (Fed.Cir. I) 861 F.2d at 690, 692. *See also New England Tank (ASBCA I)* 88–1 BCA at 1, 3, 166.

The principal parties in both actions are identical: the United States and New England Tank. The action in the ASBCA case resulted in a valid and final judgment in favor of New England Tank. The issue in this forum is the same as in the first forum.

The government is obviated from relitigating the previously decided issue of whether the contract lapsed in 1975.

The government is barred both by the doctrine of collateral estoppel and by its own agreement from relitigating the issue of whether the contract lapsed in 1975.

Partial summary judgment is entered in favor of New England Tank. The government's attempted exercise of the contract purchase option in 1980 was invalid. New England Tank is entitled to receive the fair market value of the Newington Tank Farm as of July 18, 1980, said issue to be determined by jury trial.

The government's motion for partial summary judgment is denied.