## SUPERIOR COURT OF THE VIRGIN ISLANDS

## DIVISION OF ST. THOMAS AND ST. JOHN

DR. TYLUR ARVIDSON and DR. TYGUE ARVIDSON,  ) CASE NO. ST-16-CV-410

            ) CITE AS 2020 VI SUPER 36

    Plaintiffs,

    v.

DR. WILLIAM BUCHAR and V.I. CHIROPRACTIC, LLC,)

    Defendants.

## MEMORANDUM OPINION

¶1. Before the Court are two motions *in limine* from William Buchar. First, Buchar asks to bar the testimony of Tylur and Tygue Arvidson's expert witness, economist Chad Hoekstra, arguing that Plaintiffs contravened Virgin Islands Rule of Civil Procedure 26 by failing to produce documents after Hoekstra's deposition. Because the Arvidsons produced 12 of the 18 documents requested by Buchar at Hoekstra's deposition, and because Hoekstra has searched for and cannot locate materials relating to the remaining five oral presentations and the podcast requested, Buchar's motion is denied.

¶2. Second, Buchar asks the Court to bar admission of all documentary and testimonial evidence relating to an alleged amendment made to Exhibit A of the V.I. Operating Agreement, claiming that the Arvidsons violated Rule 26 and a clause in Agreement which provides that amendments made to the Agreement must be reduced to writing and signed by all LLC members. Buchar requests the Court to exclude all evidence relating to an alleged amendment, including a fully-executed, amended Exhibit A to the Agreement, testimony from the Arvidsons addressing the alleged amendment to Exhibit A, and a 2015 email sent from Buchar to V.I. Chiropractic's attorney indicating Buchar knew the Arvidsons made additional capital contributions to V.I. Chiropractic and that the parties executed an amended Exhibit A to reflect this change in capital contributions. Because neither party has yet produced a fully-executed writing purporting to be an amended Exhibit A of the Agreement, that portion of the motion is held in abeyance. Testimonial evidence tending to show that an amended Exhibit A exists and was executed in

the past is not barred, based on common law contract principles and since Buchar has failed to show that

he was without notice of the Arvidsons' intent to testify to the execution and existence of the amendment.

Also, testimonial evidence which tends to show that the parties executed a modification to the member

ownership percentages because the Arvidsons made additional capital contributions to the LLC, but failed

to reduce this modification to writing, will not be barred.

## Factual and Procedural History

¶3.     A more detailed rendering of the facts giving rise to this lawsuit was provided in this Court's June

6, 2018, Memorandum Opinion.  Ultimately, this dispute arises between business partners who entered

into discussions to dissolve their business venture, V.I. Chiropractic, LLC, upon discovering they were

unable to reconcile their differences regarding management and operation of their chiropractic practice.

In the midst of these discussions and the ensuing, incomplete dissolution process, relations further

deteriorated.

¶4.     As a result, on July 12, 2016, the Arvidson initiated this lawsuit against William Buchar.[1]  After

filing a First Amended Complaint and completing subsequent motions practice, the Arvidsons claim

Buchar breached his fiduciary duties to them during buy-out negotiations by failing to execute the

dissolution of V.I. Chiropractic in an effort to lower the market value of the Arvidsons' shares in the

LLC.  They also ask this Court to dissolve the LLC.[2]

¶5.     In response, Buchar filed counterclaims asserting contractual, tort, and equitable claims.  Buchar

contends the Arvidsons breached their contractual duties owed under the Operating Agreement; that the

Arvidsons breached the covenant of good faith and fair dealing appurtenant to this contract claim,

intentionally interfered with prospective business relations, and slandered Buchar; and that the Arvidsons

---

[1] Pls.' Complaint.
[2] Pls.' First Am. Verified Compl.

were unjustly enriched as a result of their acts as members of V.I. Chiropractic.[3] The parties have fully briefed these motions addressing the discovery disputes.[4]

**Buchar's motion *in limine* to bar testimony of Chad Hoekstra.**

¶6.　Buchar seeks to bar Hoekstra under Virgin Islands Rule of Civil Procedure 26(e)(1)(A), which establishes the Territory's duty to supplement discovery production.[5] Buchar complains that (1) Plaintiffs' counsel never turned over to defense counsel the documents in a notebook Hoekstra had at his deposition on June 15, 2019; and (2) though the parties agreed to continue Hoekstra's deposition at a later date, no date has been scheduled.[6] In their opposition, the Arvidsons argue they responded to Buchar's request for documents on August 27, 2019, September 25, 2019, and September 27, 2019.[7] Attached to the Arvidsons' opposition were (1) a Notice of Production of Expert Materials dated September 25, 2019, (2) a Second Notice of Production of Expert Materials dated September 27, 2019, and (3) an email from Plaintiffs' counsel responding to Buchar's Request for Documents.[8] In the email, Plaintiffs' counsel detailed that (1) of the 18 documents requested, 12 documents had been previously produced on September 25, 2019 and September 27, 2019. With regard to the remaining documents, Plaintiffs' counsel provided the following response: "Mr. Hoskstra conducted a search for, but could not locate, this item."[9]

¶7.　In his reply, Buchar argues that the Arvidsons' counsel has failed to offer any dates for completion of Hoekstra's deposition and failed to produce the following shortened list of documents: (1) Presentation: Fair Value and Fair Market Value: Understanding Key Concepts and Hot Topics (a

---

[3] Def.'s Second Am. Countercompl.

[4] On September 13, 2019, Buchar filed a Motion *in Limine*, asking the Court to bar evidence from being presented at trial by the Arvidsons' expert witness, Chad Hoekstra. Def.'s Mot. *in Limine* (#19) to Bar Testimony of Chad Hoekstra. On September 27, 2019, the Arvidsons responded by filing an Opposition Response, to which Buchar replied on October 8, 2019. Pls.' Opp. to Def.'s Mot. *in Limine* (#19) to Bar Testimony of Chad Hoekstra; Def.'s Reply in Support of His Motion *in Limine* (#19) to Bar Testimony of Chad Hoskstra.

[5] Def.'s Mot. in Limine to Bar Testimony of Chad Hoekstra 5-6.

[6] *Id.* 4-6.

[7] Pls.' Opp. to Def.'s Mot. *in Limine* to Bar Testimony of Chad Hoekstra 2.

[8] *Id.* Exh. A, Exh. B, and Exh. C.

[9] *Id.* Exh. C.

presentation for accountants at Cherry, Bekaert, & Holland, LLP); (2) Presentation: A Roadmap to Understanding Business Valuation (presentation for Capital Financial Private Briefing); (3) Presentation: ABCs of Business Valuation: Privately Held Companies (a presentation for Homrich Berg, Atlanta, Georgia); (4) Business Valuation 123s and Case Study Analysis (presentation for two graduate level classes at Auburn University, School of Accountancy); (5) Business Valuation Basics (presentation for Wachovia Bank Financial Planning Group, Des Moines, Iowa); (6) Business Forum Show Podcast on business valuation.[10] Owing to the missing status of these documents, Buchar argues that the Arvidsons' counsel flouted V.I. R. Civ. P. 26(a) and 26(e) and, therefore, should be sanctioned under Rule 37(c) by not allowing Hoekstra to opine at trial.[11]

¶8.    V.I. R. Civ. P. 26(e) establishes counsel's duty to continually update, correct, and supplement discovery disclosures and production throughout the pre-trial motions stage of civil litigation. Specifically, V.I. R. Civ. P. 26(e)(1) provides:

> [a] party who has made a disclosure under Rule 26(a)—or who has responded to an interrogatory, request for production, or request for admission—must supplement or correct its disclosure or response . . . in a timely manner if the party learns that in some material respect the disclosure or response is incomplete or incorrect, and if the additional or corrective information has not otherwise been made known to other parties during the discovery process or in writing; or . . . as ordered by the court.[12]

Rule 26(e)(2) provides more pointed instruction when addressing a party's duty to supplement discovery disclosures related to expert witnesses "whose report[s] must be disclosed under Rule 26(a)(2)(B)..., [specifying that] the party's duty to supplement extends both to information included in the report and to information given during the expert's deposition."[13]

¶9.    The duty to supplement ensures that a party's initial discovery disclosures made under Rule 26(a)(2), which require parties to identify expert witnesses who may present evidence at trial, are complete and correct as new information becomes available during the discovery process. Certain,

---

[10] Def.'s Reply to Pls.' Opp. to Def.'s Mot. *in Limine* to Bar Testimony of Chad Hoekstra 2.
[11] *Id.* 1-4.
[12] V.I. R. Civ. P. 26(e)(1)(A)-(B).
[13] V.I. R. Civ. P. 26(e)(2).

though not all, expert witnesses are required to submit written reports addressing the subject matter to which they are engaged to opine. Rule 26(a)(2)(B) establishes that expert witnesses who have been "specially employed to provide expert testimony in the case or one whose duties as the party's employee[s] regularly involve giving expert testimony" must provide written reports. These reports must contain "a complete statement of all opinions the witness will express and the basis and reasons for them; ...the facts or data considered by the witness in forming them; ...any exhibits that will be used to summarize or support them; ...the witness's qualifications, including a list of all publications authored in the previous [ten] years; ...a list of all other cases in which, during the previous [four] years, the witness testified as an expert at trial or by deposition; and ...a statement of the compensation to be paid for the study and testimony of the case."[14]

¶10.     Buchar points not only to V.I. R. Civ. P. 26, but also to a portion of the Federal Rules of Civil Procedure Advisory Committee's notes for the 1993 amendments to Federal Rules 26(a) and 26(e) to support what is essentially a request to have the Court compel production of four professional presentations, one academic presentation, and one podcast delivered by Hoekstra in the past. What Buchar fails to make clear is whether these *specific presentations and podcast* were listed by Hoekstra as publications from the previous ten years, provided as "facts or data" considered when forming his expert opinion, or disclosed to fulfill the requirement that he supplement his discovery disclosures under Rule 26(e)(2) with regard to "information given during the expert's deposition."

¶11.     If Buchar is requesting the *content* of Hoekstra's presentations and podcast in fulfillment of Rule 26(a)(2)(B)(iv), which requires a *list* of all of Hoekstra's publications in the last ten years, then the Arvidsons have met this requirement. If Rule 26(a)(2)(B)(iv) has been satisfied, then no violation of Rule 26(e) occurred. Further, research conducted by this Court has failed to reveal an instance in which an expert witness was required to produce the contents of oral presentations in order to comply with Rule 26(a)(2)(B)(iv).

---

[14] V.I. R. Civ. P. 26 (a)(2)(B)(i)-(vi).

¶12.     If Buchar is requesting the content of Hoekstra's presentations and podcast under Rule 26(e)(2), which requires parties to supplement information given during the expert's deposition, then Buchar has failed to meet his burden. In the deposition excerpt Buchar attached to his motion, Buchar's counsel stated that he failed to receive "time reports," "time sheets," and "emails;" and, as the parties were packing up at the close of the deposition, Buchar's counsel asked about a notebook Hoekstra appeared to have in his possession.[15] However, nothing in the deposition excerpt indicates that information Hoekstra gave during his deposition referred to these presentations, to the podcast, or to the notebook. Notably, since submitting his initial motion highlighting the notebook, Buchar shortened his list of requested documents in the reply to the presentations and the podcast. In the absence of proof that information Hoekstra gave during his deposition derived from or related to these particular presentations and podcast, Buchar has not demonstrated he is entitled to relief.

¶13.     Finally, if Buchar is requesting Hoekstra's presentations and podcast under Rule 26(a)(2)(B)(ii), which requires that the Arvidsons provide the "facts and data" which Hoekstra considered when forming the opinion in his expert report, then the Arvidsons have fulfilled the requirement as well. Providing context and further information with regard to Rule 26(a)(2)(B) *in totum* are the comments provided by the Federal Rules of Civil Procedure 1993 advisory committee regarding Rule 26(a)(2)(B), from which our Rule is derived:

> Paragraph (2)(B) requires that persons retained or specially employed to provide expert testimony, or whose duties as an employee of the party regularly involve the giving of expert testimony, must prepare a detailed and complete written report, stating the testimony the witness is expected to present during direct examination, together with the reasons therefor. The information disclosed under the former rule in answering interrogatories about the "substance" of expert testimony was frequently so sketchy and vague that it rarely dispensed with the need to depose the expert and often was even of little help in preparing for a deposition of the witness. Revised Rule 37(c)(1) and Revised Rule 702 of the Federal Rules of Evidence provide an incentive for full disclosure; namely, that a party will not ordinarily be permitted to use on direct examination any expert testimony not so disclosed. Rule 26(a)(2)(B) does not preclude

---

[15] Def.'s Mot. *in Limine* (#19) to Bar Testimony of Chad Hoekstra 3-4, Chad Hoekstra Dep., 183:22-185:19, June 15, 2019.

counsel from providing assistance to experts in preparing the reports, and indeed, with experts such as automobile mechanics, this assistance may be needed. Nevertheless, the report, which is intended to set forth the substance of the direct examination, should be written in a manner that reflects the testimony to be given by the witness and it must be signed by the witness.

The report is to disclose the data and other information considered by the expert and any exhibits or charts and summarize or support the expert's opinions. Given this obligation of disclosure, litigants should no longer be able to argue that materials furnished to their experts to be used in forming their opinions—whether or not ultimately relied upon by the expert—are privileged or otherwise protected from disclosure when such persons are testifying or being disposed.[16]

¶14. Buchar points to the last sentence quoted above from the 1993 advisory committee's comments as his support for full disclosure of all of the content of Hoekstra's presentations and podcast, with no mention in his argument as to whether Hoekstra considered the presentations and podcast requested when forming his expert opinion. Further, by relying on only the last sentence above, Buchar argues that he is entitled to all of Hoekstra's work product. However, when the sentence to which Buchar points is read in the context of all the 1993 Advisory Committee's comments regarding expert testimony, the Court does not find that the 1993 comments provide a great deal of direction.

¶15. Perhaps providing more clarity are comments from the 2010 Advisory Committee's notes, which stated:

Rule 26(a)(2)(B)(ii) is amended to provide that disclosure include all "facts or data considered by the witness in forming" the opinions to be offered, rather than the "data or other information" disclosure prescribed in 1993. This amendment is intended to alter the outcome in cases that have relied on the 1993 formulation in requiring disclosure of all attorney-expert communications and draft reports. The amendments to Rule 26(b)(4) make this change explicit by providing work-product protection against discovery regarding draft reports and disclosures or attorney-expert communications.

The refocus of disclosure on "facts or data" is meant to limit disclosure to material of a factual nature by excluding theories or mental

---

[16] Notes of Advisory Committee on 1993 amendments to Federal Rule of Civil Procedure 26.

impressions of counsel. At the same time, the intention is that "facts or data" be interpreted broadly to require disclosure of any material considered by the expert, from whatever source, that contains factual ingredients. The disclosure obligation extends to any facts or data "considered" by the expert in forming the opinions to be expressed, not only those relied upon by the expert.[17]

¶16.    These comments demonstrate that the rules drafters were concerned that experts were having to produce as "facts or data" information of a factual nature that was provided to an expert by a party or their counsel and related to the matter then being litigated. Here, the titles of Hoekstra's presentations and podcast do not indicate that their contents would include information of a factual nature provided by the Arvidsons or their counsel to Hoekstra. Though the titles of the presentations and podcast suggest their content could be encompassed by "any material considered, from whatever source," the remainder of the Committee's comments make clear that, in order to require disclosure, these facts or data must also "contain[] factual ingredients" relating to the litigated matter. Nothing in Buchar's motion indicates whether the Arvidsons or their counsel provided Hoekstra with facts or data specific to this lawsuit that would be included in Hoekstra's five presentations and one podcast.

¶17.    Finally, assuming for the sake of argument that these presentations and podcast do include discoverable information, and assuming further that not producing them would be a violation of Rule 26, Hoekstra's inability to locate (and, therefore, produce) these files would show that the Arvidsons' failure to comply was substantially justified under Rule 37. First, the Arvidsons produced three additional collections of documents after Hoekstra's deposition, efforts which ultimately resulted in the production of all but six files to Buchar. Second, in their final responses to Buchar's discovery request for the remaining presentations and podcast, the Arvidsons indicated Hoekstra searched for, but could not locate, the items.[18] When providing this response, the Arvidsons' counsel is bound by V.I. R. Civ. P. 11's mandate that motions filed before the Court are "not being presented for any improper purpose," have

---

[17] Notes of Advisory Committee on 2010 amendments to Federal Rule of Civil Procedure 26.
[18] Pls.' Opp. to Def.'s Mot. in Limine to Bar Testimony of Chad Hoekstra 2.

"evidentiary support," or "are warranted on the evidence."[19] The Court has no basis for questioning the representation of Hoekstra or the Arvidsons' counsel that these items could not be found.

¶18.    Accordingly, this Court finds that no Rule 26 violation has occurred with regard to Hoekstra's presentations and podcast. Buchar's motion *in limine* to bar the testimony of expert Chad Hoekstra is denied.

**Buchar's motion *in limine* to bar evidence of an amended operating agreement.**

¶19.    Defendant also requests that the Court "bar testimony or any evidence of any Amended Operating Agreement being presented at trial by the Arvidsons."[20] Specifically, Buchar points out that the Arvidsons have not produced an amended operating agreement for V.I. Chiropractic during discovery. Buchar also argues the Arvidsons have not produced any other legally enforceable documents evidencing the parties executed a writing amending V.I. Chiropactic's original Operating Agreement Exhibit A, which documents each member's ownership percentage at the LLC's inception.[21] Due to this lack of documentation, Buchar asserts that the Arvidsons violated Rule 26 and a contractual clause requiring any modifications of the Operating Agreement to be in writing. As a result, according to Buchar, "any testimony by the Plaintiffs of an amended LLC [o]perating [a]greement [having been] signed and entered into between the parties is nothing more than inadmissible conjecture or speculation."[22] Ultimately, Buchar asks the Court to use its Rule 37(c)(1) authority to prevent the Arvidsons from using any evidence which indicates that the parties amended V.I. Chiropractic's original Operating Agreement to reflect that (1) the Arvidsons made additional capital contributions to the LLC and (2) their additional capital contributions increased their ownership percentages from one percent to 20 percent respectively.

¶20.    In response, Plaintiffs point to evidence addressing either the existence of an amended operating agreement or their contention that the LLC members reached some sort of a new agreement, orally or via

---

[19] V.I. R. Civ. P. 11(b)(1), (3), and (4).
[20] Def.'s Mot. in Limine (#20) 1.
[21] *Id.* 1-2.
[22] *Id.* 2.

conduct, regarding the Arvidsons making additional capital contributions, therein modifying their LLC ownership percentages. Those pieces of evidence are: (1) deposition testimony of Tylur Arvidson; (2) deposition testimony of Tygue Arvidson; and (3) a December 2015 email originally written by and sent from Buchar to his and V.I. Chiropractic's attorney. In addition, they cite this Court's Memorandum Opinion dated September 11, 2019, which recognized the Arvidsons' allegations that they increased their capital contributions to amounts representing 20 percent of V.I. Chiropractic's initial capital contributions.[23]

¶21.    Before turning to the specifics of this discovery dispute, the Court must address a preliminary issue. Plaintiffs are correct in stating that the Court's September 11, 2019 Memorandum Opinion specifically noted that the "Arvidsons initially contributed $1,000.00 each... [and d]uring the latter stages of V.I. Chiropractic's development, the Arvidsons increased their contributions to amounts representing twenty percent of the LLC's capital investments, respectively. . . ."[24] However, these statements regarding increased capital contributions and increased ownership percentages, which the Arvidsons contend are "facts", were made in the context of a determination whether the parties' dealings were more akin to an employment relationship as opposed to a partnership for purposes of analyzing the validity of a covenant to not compete in the Operating Agreement. To accomplish this task, the Court weighed assertions of both parties—disputed facts—as required by the Rules of Civil Procedure creating the parties' respective responsibilities.

¶22.    V.I. R. Civ. P. 56(a) sets out the Territory's basic rule statement regarding summary judgment motions. More importantly, Rule 56(c)(1)-(3) establishes the burden-shifting mechanism that governs the parties' responsibilities when asserting and defending motions for summary judgment.[25] Subsection (c)(1) directs movants to provide the Court with a "statement of undisputed facts." Subsection (c)(2)(B) directs non-movants to submit oppositions to the Court that either "agree that [a] fact is undisputed" or

---

[23] Pls.' Opp. to Def.'s Mot. in Limine (#20).
[24] *Arvidsons v. Buchar*, 2019 VI SUPER 122, at ¶ 53, 2019 V.I. LEXIS 2019, at *53-*56 (V.I. Super. Ct. Sept. 11, 2019).
[25] V.I. R. Civ. P. 56(c)(3).

"stat[e] that [a] fact is disputed." As an alternative, Subsection (c)(2)(C) provides that non-movant parties may "if [they] elect to do so, state additional facts that the party contends are disputed and material to the motion for summary judgment…[and] supply affidavits(s) or citations specifically identifying the location(s) of the materials(s) in the record relied upon as evidence." Finally, Subsection (c)(3) enables movants to reply to the non-movant's opposition and respond to the non-movant's additional facts, allegations, and assertions by agreeing or disagreeing with them.

¶23.    Rule 56(e) specifies that, when a party either fails to support an allegation by pointing to its evidentiary basis in the record or fails to address an opposition party's allegation, then the Court is able to allow the party an opportunity to support or address a fact, to consider the fact as undisputed, to grant the summary judgment, or to "issue any other appropriate order." In addition, Rule 56(f)(1)-(3) provides that "[a]fter giving notice and a reasonable time to respond, the [C]ourt "may . . . grant summary judgment for a nonmovant; . . . grant the motion on grounds not raised by a party; or . . . consider summary judgment on its own after identifying for the parties materials facts that may not be genuinely in dispute."[26] The use of the word "may" is important. Differing background storylines and competing descriptions of evidence are necessarily presented by adversaries in their Rule 56 motions to this Court. First, the nature of Rule 56(c)'s burden-shifting mechanism used to weigh evidence demands it. Second, because the Court has the option under Rule 56(f) to grant summary judgment for a non-movant, or on grounds not raised by a party, or *sua sponte* after identifying material facts that may not be genuinely in dispute, the dueling nature of the parties' storylines and descriptions plays a crucial role. In order to make a sound decision with regard to whether to grant summary judgment and upon what points of legal authority and factual allegations to base that decision, the Court relies upon the parties' dueling storylines and evidentiary descriptions. They are necessarily summarized and included in the facts section and the analysis section of memorandum opinions because they provide context for the Court's legal analysis and Rule 56 determination.[27]

---

[26] V.I. R. Civ. P. 56(f).
[27] *Id.*

¶24.    Here, in deciding whether to grant summary judgment with regard to the validity of V.I. Chiropractic's non-compete clause, the Court necessarily listed multiple factors characterizing the parties' business relations. These factors consisted of factual allegations, which included the parties' documented and alleged initial capital contributions; who was Manager of the LLC; and who had the power to replace the Manager, to establish business practices and strategies, to transact business for the LLC, to make all bank withdrawals for the LLC, and to adjust the Arvidsons' work responsibilities.[28] While the Court considered the Arvidsons' allegations claiming a 40 percent ownership interest alongside other allegations and the pieces of evidence just listed, the ultimate determination made by the Court was that, even assuming those allegations were true, the Arvidsons did not wield enough economic power or legal authority to characterize the parties' relationship as one more akin to a partnership for the purposes of analyzing the covenant to not compete—not that the Arvidsons owned 40 percent of V.I. Chiropractic as a finding of fact.

¶25.    Whether the Arvidsons presented evidence showing that they own 40 percent of the LLC or only two percent of the LLC, both percentages counseled the Court to determine, for the purposes of weighing competing evidence in a summary judgment motion addressing a covenant to not compete, that the parties' relationship was more akin to an employment relationship. Accordingly, the Court's inclusion of the Arvidsons' allegations of their alleged increased capital contributions for purposes of assessing the validity of a covenant to not compete does not equate to the Court finding that the Arvidsons increased their capital contributions to V.I. Chiropractic under V.I. R. Civ,. P. 52(a)(1).[29] The allegation was included because it was necessary for the Court to apply law to background storylines and competing factual allegations in order to determine whether a covenant to not compete was valid, and nothing more.

---

[28] *Id.* at ¶ 53 - ¶ 56.

[29] V.I. R. Civ. P. 52(a)(1)(A) ("In an action tried on the facts without a jury or with an advisory jury, the court must find the facts specially and state its conclusions of law separately. The findings and conclusions may be stated on the record after the close of the evidence or may appear in an opinion or a memorandum of decision filed by the court. Judgment must be entered under Rule 58."); V.I. R. Civ. P. 52(a)(1)(B) ("In a non-jury case, the litigants must file proposed Findings of Fact and Conclusions of Law within 21 days after the conclusion of trial."). See also V.I. R. Civ. P. 52(a)(3) ("The court is not required to state findings or conclusions when ruling on a motion under Rule 12 or 56 or, unless these rules provide otherwise, on any other motion.").

### Buchar's request to bar documentary evidence purporting to be an amended Exhibit A of the V.I. Chiropractic Operating Agreement.

¶26.    Rule 26(a)(1)(A)(ii) requires that opposing parties engaged in civil litigation in this Territory "must, without awaiting a discovery request, provide to the other parties...a copy of all documents, electronically stored information and tangible things that the disclosing party has in its possession, custody, or control and may use to support its claims and defenses, unless the use would be solely for impeachment, unless it would be unduly burdensome to produce a copy of an item, in which case each item must be clearly identified, along with a statement as to why each cannot readily be copied."[30]

¶27.    In their response to Buchar's motion, the Arvidsons, have not shown proof of having provided a copy of a fully-executed amended operating agreement by the deadline established for submitting documents in compliance with V.I. R. Civ. P. 26(a)(1)(A)(ii), nor have they, despite identifying that document as one that would or could support their claims and defenses at trial, asserting that producing a fully-executed amended operating agreement is unduly burdensome.

¶28.    However, the Arvidsons did provide a copy of a December 2, 2015, email sent from Buchar to his and V.I. Chiropractic's attorney which shows that Buchar communicated the following message to his and V.I. Chiropractic's legal counsel:

> Hello Rosh,
>
>> So everyone has now paid in the initial funding of V.I. Chiropractic. The share percentages and individual funding are below:
>>
>> Bill    60% at $62,301.96
>> Tylur  20% at $20,767.32
>> Tygue 20% at $20,767.32[31]

¶29.    The December 2, 2015, email also bears two icons below the body of the message, which indicate that electronically attached files were also emailed with the message (one file in Word document format and the second file in Adobe pdf format). Both electronic

---

[30] V.I. R. Civ. P. 26(a)(1)(A)(ii).
[31] Pls.' Opp. to Def.'s Motion *in Limine* (#20), Exh. C.

files' icons were entitled "Re-Assignment of Membership Interest."[32] Stapled to the printed copy of the body of the email are three documents, which purportedly represent the attached electronic files. All are labeled as "Re-Assignment of Membership Interest", but none are signed by Buchar or the Arvidsons.[33] In addition, on the "Re-Assignment of Membership Interest" documents, Buchar is listed as having made a total of $600.00 in capital contributions and each Arvidson brother is listed as having made a total of $200.00 in capital contributions.[34] While the discrepancy between the figures in the body of the email message and the "Re-Assignment of Membership Interest" documents is marked, and while the Court is unclear whether the "Re-Assignment" documents show three different transactions or one transaction three times, the Court notes that these documents demonstrate that the parties genuinely dispute a material fact which will affect the outcome of their dissolution proceedings, as well as a possible determination of damages.

¶30.    Ultimately, Buchar asks this Court to rule that any evidence addressing an alleged amended operating agreement not be admitted at trial under Rule 37(c)(1), which provides: "If a party fails to provide information or identify a witness as required by Rule 26(a) or (e), the party is not allowed to use that information or witness to supply as evidence on a motion, at a hearing, or at a trial, unless the failure was substantially justified or is harmless." Buchar argues that the Arvidsons' failure to provide a written amended operating agreement executed by Buchar and the Arvidsons deprived Buchar of the ability to prepare a challenge to the document's admission into evidence, therein prejudicing his defense at trial.

¶31.    In their Opposition, the Arvidsons state that they disclosed to Buchar the December 2, 2015, email and its attached electronic files labeled as "Re-Assignment of Membership

---

[32] *Id.*
[33] *Id.*
[34] *Id.*

Interest" on July 6, 2019, undercutting Buchar's argument. Thus, it appears Buchar has had notice that an amended Exhibit A may exist, even if it has not been located by either party. However, since no executed document has been produced, the Court holds in abeyance a determination as to whether documentary evidence purporting to be the actual amended Exhibit A Buchar and the Arvidsons allegedly signed is admissible at trial until the document is actually located and produced.

Buchar's request to bar testimonial evidence showing the parties executed an amended Exhibit A of the V.I. Chiropractic Operating Agreement.

¶32. Rule 26(a)(1)(A)(i) requires parties in civil litigation to automatically and "without awaiting a discovery request" to produce to their opposing counsel and parties "the name and, if known, the address and telephone number of each individual likely to have discoverable information."[35]

¶33. Buchar argues that the Arvidsons violated that rule by failing to produce a fully executed, amended operating agreement for V.I. Chiropractic. However, Rule 26(a)(1)(A)(i) mandates the disclosure of the names of individuals who may testify at trial due to the likelihood of their having discoverable information regarding the parties' claims or defenses. Buchar failed to provide copies of the Arvidsons' initial Rule 26 disclosures with his motion,[36] thus Buchar has failed to show that the Arvidsons' did not list themselves as potential witnesses in their initial Rule 26 disclosures. Further, the Arvidsons have attached to their opposition copies of transcripts of their own depositions conducted by Buchar's counsel in 2018 showing Buchar's counsel had notice the Arvidsons could and would testify to an agreement to modify of the members' capital contributions and ownership interest percentages.[37]

¶34. The policy undergirding Rule 26 disclosures works to ensure parties are not prejudicially caught unprepared for certain evidence presented at trial. Assuming for the sake of argument that the Arvidsons' initial Rule 26 witness disclosure list did not include their own names (something Buchar has failed to

---

[35] V.I. R. Civ. Pr. 26(a)(1)(A)(i).
[36] *See* Def.'s Mot. in Limine (#20).
[37] Pls.'s Opp. to Def.'s Mot. in Limine (#20), Exhs. A, B.

show in this motion), in their opposition the Arvidsons, have produced deposition testimony illustrating that (1) Buchar has knowledge that Tylur and Tygue Arvidson have discoverable information regarding their claims against him, specifically that the parties agreed to modify their LLC's original capital contributions and their LLC's original member ownership percentages and, (2) because the Arvidsons were deposed by Buchar's attorney on December 5, 2018, Buchar has knowledge that both Tylur and Tygue Arvidson have discoverable information addressing a subsequent amendment of Exhibit A which documents the LLC's alleged modification in member ownership percentages. To substantiate their allegations, the Arvidsons attached transcripts of depositions in which Buchar's attorney extensively questioned Tylur and Tygue Arvidson about an amended Exhibit A of the Operating Agreement, when this amendment was reduced to writing and signed by both parties, whether the amendment was notarized before the Arvidsons signed it, whether the Arvidsons made a photocopy of the document, where the Arvidsons allegedly placed their own copy of the amended Exhibit A in V.I. Chiropractic's offices, whether the Arvidsons scanned a copy of the amended Exhibit A creating an electronic record of the signed document, and the Arvidsons' production of an earlier version of the amended Exhibit A that was emailed from Buchar to Tygue Arvidson memorializing the change in Exhibit A's membership percentages.[38] While Buchar failed to include any Rule 26(a)(A)(i) disclosures from the Arvidsons that failed to list the Arvidsons as possible witnesses at trial, deposition transcripts show both were disposed and extensively questioned about an alleged amended Exhibit A of the operating agreement, as well as about the modification the alleged amended Exhibit A sought to embody. Any prejudice that would have negatively impacted Buchar's defense at trial was defused by this line of deposition questioning.

¶35.    As a final matter, while a Rule 26(a)(1)(A)(i) violation has not been found, the Court must determine whether the Virgin Islands LLC Act allows a subsequent modification made to a Virgin Islands LLC operating agreement to be executed by an oral agreement or by the parties' conduct or contract performance. More specifically, do Virgin Islands courts admit this type of evidence to show that a

---

[38] *Id.*

modification of the operating agreement was effectuated where the original operating agreement at issue contains a clause requiring any modifications made to it be reduced to writing?

¶36.    Chapter Thirteen Section 1104 of the Virgin Islands Limited Liability Act addresses LLC operating agreements, setting out what must, may, and may not be included in an LLC operating agreement.  Most informative to our present determination is 13 V.I.C. § 1104(a)'s provision indicating that "all members of a limited liability company *may* enter into an operating agreement, which *need not be in writing.*"[39]  Under the LLC Act's plain language, the Court is not empowered to require Virgin Islands LLCs and their members to enter into and create operating agreements.  If the LLC members enter into an operating agreement, which they are allowed to do, the Court is similarly not empowered to require that the operating agreement be reduced to writing.

¶37.    Notably, however, 13 V.I.C. § 1104 makes no mention of modifications made to operating agreements.  As a result, the Court turns to the traditional tools of statutory interpretation when determining issues relating to the LLC Act.  We will construe words and phrases "according to . . . common and approved usage."[40]

¶38.    Under the plain language of 13 V.I.C. § 1104(a), because the Court lacks the authority to compel LLC members to create and enter an operating agreement or to reduce an operating agreement to a written instrument, it stands to reason that the Court cannot mandate that LLC members must reduce any modification of an operating agreement to a written instrument.  Accordingly, the Court turns to traditional contract law principles to determine whether the Arvidsons may testify to the existence of a subsequent modification made to V.I. Chiropractic's Operating Agreement Exhibit A even though the LLC's original Operating Agreement contains a clause requiring that all modifications be in writing.

¶39.    "It is well settled that an enforceable contract requires an offer and acceptance.  An enforceable contract also requires consideration (the bargained-for legal benefit and/or detriment), and a manifestation

---

[39] 13 V.I.C. § 1104(a).
[40] *Rennie v. Hess Oil V.I. Corp.*, 62 V.I. 529, 545 (V.I. 2015) (citing 1 V.I.C. § 42).

of mutual assent."[41] "Where there is a question of mutual consent, the Court may look outside the four

corners of [a written] agreement because the manifestation or expression of assent necessary to form a

contract may be by word, act, or conduct which evinces the intentions of the parties to contract."[42]

"When examining a contract, the Court is to interpret the contracting parties' intent as objectively

manifested by them."[43]

¶40.　　Contract modification similarly requires a manifestation of mutual assent. "Contracting parties...

may evince [a] mutual intent to modify the terms of their contract"[44] through written words, acts,

sustained course of conduct, and oral agreement. The circumstances evidencing the parties' conduct, acts,

or oral agreements not reduced to a writing "must be sufficient to support [the court's] finding of [a]

mutual intention that the modification be effective"[45] and of consideration exchanged. Therefore, "a

contract [reduced to] writing, but not required to be so by the statute of frauds, may be dissolved or varied

by a new oral contract [or acts or a course of performance], which may or may not adopt as part of its

terms some or all of the provisions of the original written contract."[46]

¶41.　　Further, "parties may orally modify an agreement where evidence shows that was their intent...

notwithstanding a provision in a written agreement that precludes oral modification [because] the parties

may, by their words or conduct, waive contractual rights"[47] such as clauses requiring modification be

---

[41] *Peppertree Terrace v. Williams*, 52 V.I. 225, 241 (V.I. 2009) (Swan, J. concurring) (citing *Fletcher-Harlee Corp. v. Pote Concrete Contractors, Inc.*, 482 F. 3d 247, 250 (3d Cir. 2007) and *Navair, Inc. v. IFR Americas, Inc.*, 519 F. 3d 1131, 1137-39 (10th Cir. 2008). The Court notes that *Peppertree* was decided in 2009, before *Banks*' mandate was handed down by the Virgin Islands Supreme Court. The Court also notes that since then, *Toussaint v. Stewart*, 67 V.I. 931 (V.I. 2017), was also decided. There, the Virgin Islands Supreme Court remanded the trial court's decision regarding enforcement of a mediated settlement agreement because the trial court failed to conduct a *Banks* analysis of what elements form a legally enforceable contract in the Virgin Islands as well as how those elements (i.e., offer, acceptance, and mutual assent) are defined. *Id.*, 67 V.I. at 951-52. However, this motion's determination turns on contract modification, whether based in words or conduct, and not on the definitions of a contract's offer, acceptance, and consideration. This fact, in addition to the fact that this determination works to interpret the LLC statutory regime, leads the Court to proceed with its analysis instead of committing further judicial resources to conduct a *Banks* analysis of terms on which this determination is not based.
[42] *United States v. Toscano*, 799 F. Supp. 230, 240 (E.D.N.Y. 2011).
[43] *Mountaintop v. Columbia Emeralds International*, 43 V.I.193, 201 (V.I. 2001).
[44] *In re Quantum Cool, LLC*, 2013 Bankr. LEXIS 2822, at *33-*37 (E.D.N.C. 2013).
[45] *Id.*
[46] *Id.* at *33.
[47] *Eurolog Packing Grp. v. EPG Industries, LLC*, 2019 U.S. Dist. LEXIS 129281, at *6-*7 (2019).

effectuated in writing. "As a general rule, if a contract provides that a writing is necessary to amend it, the parties may, by their [words or] conduct, waive such a provision."[48] Courts outside this jurisdiction have noted in the past that "the common law . . . takes a skeptical view of contract provisions requiring modifications to be in writing."[49] Labeled by some as "a kind of private statute of frauds for contracting parties," clauses requiring modification to be put in writing have "generally not been given full effect by courts"[50] across jurisdictions. Ultimately, while an agreement may include such a clause, that term of the agreement can be modified "by subsequent oral agreement or a course of dealing with one another [evidencing a subsequent agreement or waiver] despite the requirement of a writing in order to modify."[51]

¶42. When assessing circumstances alleged to evidence a waiver, the Court looks for acts and words that illustrate "an intentional relinquishment or abandonment of"[52] the contract term requiring that any contract modification be written. "[T[he scope of waiver must be based upon the facts of each case; and the court must be guided by fairness concerns."[53] In contrast, when assessing circumstances alleged to evidence a subsequent oral agreement, the Court looks for words or conduct "sufficient to support [the court's] finding of [the parties'] mutual intent[]"[54] to modify the contract term requiring written modification.

¶43. While clauses of this nature are designed to protect against the introduction of fraudulent or mistaken evidence concerning transactions executed subsequent to a written contract,[55] certain policy considerations undergird courts' decisions to not enforce contract terms requiring modifications be reduced to writing. First, the freedom to contract and to re-contract would be hampered upon the enforcement of such clauses. "[P]arties to a contract possess and never cease to possess the freedom to

---

[48] *Id.*

[49] *Central Illinois Public Service Co. v. Atlas Minerals, Inc.*, 965 F. Supp. 1162, 1172 (C.D. Ill. 1997).

[50] *Fields Excavating, Inc. v. McWane, Inc.*, 2009-Ohio-5925, at *¶ 19, 2009 Ohio App. LEXIS 4994, at **10 (Ohio Ct. App. Nov. 9, 2009).

[51] *Allapattah Servs. v. Exxon Corp.*, 61 F. Supp. 2d 1308, 1317 (S.D. Fla. 1999).

[52] *Johnson v. Zerbst*, 304 U.S. 458, 464 (1938).

[53] *In re OM Securities Litigation*, 226 F.R.D. 579, 591 (N.D. Ohio 2005).

[54] *See In re Quantum Cool, LLC*, 2013 Bankr. LEXIS at *33-*37 (E.D.N.C. 2013).

[55] *Fields Excavating, Inc.*, 2009-Ohio-5925 at *¶ 15, 2009 Ohio App. LEXIS at **7.

contract even after the contract has been executed[;]...what the parties have consented to do, they can later consent to abandon."[56] But perhaps Justice Cardozo articulated the concept most clearly:

> Those who made a contract may unmake it. The clause which forbids change, may be changed like any other. The prohibition of oral waiver, may itself be waived. Every such agreement is ended by the new one which contradicts it. What is excluded by one act is restored by another...Whenever two men contract, no limitation self-imposed can destroy their power to contract again.[57]

When courts strictly enforce clauses of this type, they "deny effect to every oral modification [and waiver]—even those that are fully voluntary, freely entered, and entirely consensual—simply because there was no writing."[58]

¶44.    Second, enforcement of these clauses encourages lawyers and judges to assume that post-contract signing language and actions have no legal significance. "[I]f the parties [do] go on to make an oral modification after they agreed on a no-oral-modification clause then their subsequent agreement must be taken as itself modifying, or at least waiving, the no-oral modification clause."[59] On the other hand, if the clause were allowed to take precedence over the parties' actions, then conduct evidencing the parties' intent would not be given effect.

¶45.    Third, inserting clauses of this type makes it easier for a contracting party, when not satisfied with the result or the fallout of a subsequent oral or conduct-based modification, to invoke the clause he or she has waived or forfeited with previous actions or words. What is problematic about doing so is that it "suggests that parties can, through the right words, invoke a power beyond their own; if such clauses are rigidly enforced, then a party could simply insert the clause into an agreement and would be magically protected in the future no matter what the party said or did...[Indeed] a party could orally induce the opposing party in any way and then hide behind the clause as a defense."[60]

---

[56] *Fields Excavating, Inc.,* 2009-Ohio-5925 at *¶ 16, 2009 Ohio App. LEXIS at **8-**9.
[57] *Beatty v. Guggenheim Exploration Co.,* 225 N.Y. 380, 387-88 (N.Y. 1918).
[58] *Fields Excavating, Inc.,* 2009-Ohio-5925 at *¶ 16, 2009 Ohio App. LEXIS at **8-**9.
[59] *Id.,* 2009-Ohio-5925 at *¶ 17, 2009 Ohio App. LEXIS at **9.
[60] *Id.,* 2009-Ohio-5925, at *¶ 17, 2009 Ohio App. LEXIS 4994, at **9-**10.

¶46.    Here, Buchar points to Article 20.1 of the V.I. Operating Agreement. Entitled "Entire

Agreement; Amendment," it states:

> This Agreement along with the Articles of Organization (together, the
> "Organizational Documents"), [sic] constitute the entire agreement
> among the Members and replace and supersede all prior written and oral
> understandings and agreements with respect to the subject matter of this
> Agreement, except as otherwise required by the Limited Liability Act.
> There are no representations agreements arrangements, or undertakings,
> oral or written, between, or among the Members relating to the subject
> matter of this Agreement that are not fully expressed in the
> Organizational Documents. This Agreement may not be modified or
> amended in any respect, except in a writing signed by all of the
> Members, except as otherwise required or permitted by the Limited
> Liability Company Act.[61]

¶47.    The first two sentences of Article 20.1 make clear that this version of the Operating Agreement,

executed on June 29, 2015, by the Arvidsons and on July 14, 2015, by Buchar, represents all the terms

both parties initially agreed to have govern their business. If the parties were disputing certain details

negotiated and agreed to prior to and simultaneous with the execution of this, the original, Operating

Agreement, analysis grounded in the parole evidence rule would apply.

¶48.    However, Buchar rests his motion *in limine* on the last sentence, providing, "This Agreement may

not be modified or amended in any respect, except in a writing signed by all Members, except as

otherwise required or permitted by the Limited Liability Company Act."[62] This clause expressly states

that Buchar and the Arvidsons agreed that if they modified or amended this agreement *in the future*, the

modification would only be transacted in written form. The terms "modified" and "amended" are

forward-looking, intended to apply to the parties' transactions as they may exist after the summer of 2015.

¶49.    Exhibit A of the original V.I. Chiropractic Operating Agreement, also executed on June 29,

2015, by the Arvidsons and on July 14, 2015, by Buchar, details that Buchar and the Arvidsons made the

following capital contributions, resulting in the corresponding member ownership percentages:

William L. Buchar        $98,000.00        98%

---

[61] V.I. Chiropractic Operating Agreement, Article 20.1.
[62] *Id.*

| Tylur Arvidson | $1,000.00 | 1% |
| Tygue Arvidson | $1,000.00 | 1% |

¶50.    In their Complaint, the Arvidsons allege they initially made capital contributions of $1,000.00 each, each garnering a one percent member ownership percentage of V.I. Chiropractic.  The Arvidsons also allege that they made additional capital contributions of $20,000.00 each in November 2015 with funds coming from their distributions received as members as V.I. Chiropractic.[63]

¶51.    In his Second Amended Countercomplaint, Buchar alleges each of the Arvidsons made capital contributions of $1,000.00 each, while he made a capital contribution of $98,000.00. [64]  The amounts of these contributions, he alleges, resulted in him owning 98 percent of V.I. Chiropractic.[65]  In the same paragraphs, Buchar also charges that the Arvidsons never actually paid $1,000.00 in capital contributions, but represents that they, nonetheless, each hold a one percent interest in V.I. Chiropractic.[66]  Deeper into his Second Amended Countercomplaint, Buchar acknowledges that the Arvidsons allege they each paid $20,000.00 in additional capital contributions.  Though he does not expressly deny their allegations regarding the $20,000.00 payments, he continues the paragraph, "The Operating Agreement has never been amended from its original form; at best, the Third Party Defendants each own 1% of V.I. Chiropractic LLC.  The Arvidsons did not attach the requisite amendment to the Operating Agreement supporting their allegations."[67]

¶52.    In asking the Court to bar testimonial evidence at trial which tends to show that the Arvidsons made additional capital contributions of $20,000.00, Buchar points to the clause requiring amendments to the original V.I. Chiropractic Operating Agreement be reduced to writing.  Then Buchar notes the absence of a fully-executed Exhibit A showing both parties agreed to and acknowledged the Arvidsons made

---

[63] Pls.' Am. Compl.; Tylur Arvidson Dep., 122:1-123:2, Dec. 5, 2018.
[64] Def.'s Second Am. Countercompl. ¶¶ 1-2.
[65] *Id.* ¶ 3.
[66] *Id.* ¶ 3.
[67] *Id.* ¶ 9.

additional $20,000.00 capital contributions which resulted in an increase in each of their ownership percentagest

¶53.    In their response, the Arvidsons submitted depositions of both Arvidsons and an email sent from Buchar to his and V.I. Chiropractic's attorney. In Tylur Arvidson's deposition, the Court observes that Buchar's attorney questioned Tylur Arvidson regarding whether he signed an amended Exhibit A; whether the amended Exhibit A was notarized; whether a physical copy of the amended Exhibit A was filed in a file cabinet in V.I. Chiropractic's office; whether the amended Exhibit A reflected the Arvidsons having ownership percentages amounting to 20 percent each and Buchar having to 60 percent; whether Tylur Arvidson received a draft copy of a proposed amended Exhibit A before December 2, 2015; whether Tylur received, what he alleges, is the amended Exhibit A; and whether he received a copy of an email sent from Buchar to V.I. Chiropractic's attorney memorializing the amendment.[68] In Tygue Arvidson's deposition, Buchar's attorney questioned Tygue Arvidson regarding whether he recalled signing an amended Exhibit A.[69] Finally, the Court notes the December 2, 2015 email sent from Buchar to V.I. Chiropractic's attorney which reflects Buchar communicating that (1) all members had made their full capital contributions that resulted in a new breakdown of V.I. Chiropractic's ownership percentages, and (2) electronic files were included in the email which recorded changed member ownership percentages.

¶54.    When viewing this evidence together, the parties dispute (1) whether the Arvidsons made additional capital contributions to V.I. Chiropractic and (2) whether these additional capital contributions led the parties to modify the V.I. Chiropractic Operating Agreement to reflect an increase of the Arvidsons' ownership percentages. The original Exhibit A illustrates the parties' intent to structure V.I. Chiropractic's ownership with the Arvidsons each owning one percent of the LLC and Buchar owning the remainder. When arguing the original percentages continue to reflect the allocation of V.I. Chiropractic's ownership, Buchar points to Article 20.1's text and the absence of a fully-executed, amended Exhibit A.

---

[68] Tylur Arvidson Dep., 123:6-138:12, Dec. 5, 2018.
[69] Tygue Arvidson Dep., 98:4-104:19, Dec. 6, 2018.

¶55.     The Court will not enforce Article 20.1 and its requirement that modifications be reduced to writing in order to bar testimonial evidence.  First, the V.I. LLC Act does not require operating agreements to be reduced to a written instrument.  Second common law jurisprudence does not counsel in favor of enforcing contractual clauses of this type.  Third, Buchar' email tends to show that (1) a modification of the LLC's ownership percentages was completed or was intended to be completed with the execution and filing of the attached electronic files labeled as "Re-assignment of Ownership Interest" and (2) the modification or intended modification resulted from further investment made by the Arvidsons and led to Buchar's owning 60 percent of V.I. Chiropractic and the Arvidsons each owning 20 percent.

¶56.     Even if a fully-executed amended Exhibit A signed by both parties was not finalized or was finalized but lost, the Arvidsons have produced evidence tending to show they and Buchar agreed to alter, intended to agree to alter, or in fact did alter V.I. Chiropractic's ownership percentages.  A contractual clause requiring contract modifications be reduced to writing does not bar the evidence's admission. Buchar and the Arvidsons had and still have the freedom to contract and re-contract in a non-written format.  Barring this evidence would give the impression that the parties' post-contract actions and language bore no legal effect on their contract.  Whether the Arvidsons made additional capital contributions to V.I. Chiropractic and whether V.I. Chiropractic's ownership percentages changed as a result of that investment is an issue of fact to be determined by the factfinder at trial.

¶57.     Clearly, even in the absence of a fully executed Exhibit A, it is beyond cavil that Buchar had notice of his own email, such that it is potentially admissible as an admission against interest.  In addition, the fact that the trial date has been indefinitely postponed lessens any potential prejudice to Buchar, since he has now had even more notice of this proposed evidence and of his need to defend against it.  Thus, the email and the testimony of the Arvidsons is admissible.

## Conclusion

¶58.    For the reasons stated, Defendant's motion *in limine* (# 19) to bar testimony of Chad Hoekstra is

denied, and Defendant's motion *in limine* (# 20) to bar documentary and testimonial evidence of an

amended operating agreement is held in abeyance in part and denied in part.  An order consistent with this

Opinion shall issue.

Dated:    MARCH 10, 2020

ATTEST: Tamara Charles
Clerk of Court

by:
Donna D. Donovan
Court Clerk Supervisor  3/11/2020

HON. MICHAEL C. DUNSTON
JUDGE OF THE SUPERIOR COURT
OF THE VIRGIN ISLANDS